```
1
2            COMMONWEALTH OF MASSACHUSETTS
          COMMISSION AGAINST DISCRIMINATION
3
                      MCAD Docket No.
4                     EEOC Number:  16C-2010

   * * * * * * * * * * * * * * * * * *  *
5                                       *
   NINA SHERVIN, MD,                    *
6                                       *
              Complainant              *
7                                       *
       v.                               *
8                                       *
   ORTHOPEDIC ASSOCIATES, HARVARD       *
9  UNIVERSITY/HARVARD MEDICAL SCHOOL,   *
   THE PRE, PARTNERS HEALTHCARE SYSTEM, *
10 INC., HARRY E. RUBASH, MD., and      *
   JAMES H. HERNDON, M.D.,              *
11                                      *
              Respondents              *
12                                      *
   * * * * * * * * * * * * * * * * * *  *
13

14
              DEPOSITION OF:  PATRICIA APRILE
15

16     BEFORE:  Lisa Fitzgerald, Notary Public, at Goodall

17 Hospital, 25 June Street, Sanford, Maine on May 14, 2012

18 beginning at 10:18 a.m.

19

20

21

22

23
                Maine Court Reporting Services
24                   207-989-3264
                     www.MeCRS.com
25
```

1          THE WITNESS:  Yes.

2     BY MR. HOLTZ:

3     Q.    -- correct?  What did the hospital decide in February

4           2012?

5                MS. ZUCKER:  Objection.

6                THE WITNESS:  Not to renew the contract.

7                MR. HOLTZ:  Right.

8     BY MR. HOLTZ:

9     Q.    Let me show you what I'm going to mark as Exhibit 8, if

10          I could.

11               (Deposition Exhibit No. 8, February 24, 2012 Letter

12          to Nina Shervin, MD from Patricia Aprile, was marked for

13          identification.)

14    BY MR. HOLTZ:

15    Q.    And did you to take a look at Exhibit 8?

16    A.    Yes.

17    Q.    Do you recognize this document?

18    A.    I do.

19    Q.    Is that your signature at the bottom of the page?

20    A.    It is.

21    Q.    And do you remember drafting this letter?

22    A.    I do.

23    Q.    Can you identify the document for us?

24    A.    I can.  It's the document essentially making note of the

25          fact of we're exercising our right of the nonrenewal of

 1          our contract.

 2     Q.   Does that mean terminating Dr. Shervin's employment

 3          agreement?

 4               MS. ZUCKER:  Objection.

 5     BY MR. HOLTZ:

 6     Q.   Is that what you're giving notice of?

 7               MS. ZUCKER:  Objection.

 8               THE WITNESS:  I'm giving notice of when it's time

 9          to renew her contract that we are not going to be

10          renewing her contract, so we're letting the current

11          contract run out, and that we won't be signing on

12          another two years.

13     BY MR. HOLTZ:

14     Q.   So you had just decided to sign an agreement with

15          Dr. Shervin in December of 2011?

16     A.   Correct.

17     Q.   What changed in the ensuing weeks between then and the

18          date of Exhibit 8?

19     A.   I don't know that anything changed.  I think it just

20          became clearer and clearer that -- you know, the

21          relationship wasn't working, but let me explain what I

22          mean by that.

23               From a total volume, we have three orthopedic

24          surgeons, we need three orthopedic surgeons for a call

25          perspective, but in fairness, there's only so much

1          volume to go around in this small community, so you had

2          that piece, which does explain some of the productivity,

3          but also -- I also believe that Dr. Shervin, perhaps

4          based on her credentials and coming from a bigger place

5          to a smaller place, this just probably isn't the best

6          place for her, and I think we both agreed with that.

7     Q.   Any other reasons why the hospital decided to not renew

8          Dr. Shervin's employment?

9     A.   Nothing substantial.  In other words, yeah, there might

10         be -- we might have mentioned citizenship issues, but,

11         again, if you look at all the medical staff, you'll find

12         that there are citizenship issues.

13              So I would say maybe little things, but from a

14         substantial perspective, it's really about volume and

15         fit.

16    Q.   By the way, this was the hospital's decision; correct?

17    A.   It was.

18    Q.   Was the hospital influenced by anyone outside the

19         hospital?

20    A.   Absolutely not.

21              MS. ZUCKER:  Objection.

22    BY MR. HOLTZ:

23    Q.   This decision -- did this decision have any external

24         influences at all?

25              MS. ZUCKER:  Objection.

1          THE WITNESS:  I'm not sure I understand your

2       question.

3    BY MR. HOLTZ:

4    Q.   Was the hospital influenced by anyone at MGH, for

5       example?

6    A.   Oh, absolutely not.

7    Q.   Or partners?

8    A.   No.

9    Q.   Or anyone having to do with this lawsuit?

10   A.   No.

11   Q.   These reasons that you just described:  The capacity for

12      productivity, fit, and citizenship --

13          MS. ZUCKER:  Objection.

14   BY MR. HOLTZ:

15   Q.   -- were those -- what about those -- what about the

16      hospital's understanding of those items changed since

17      December 2011?

18          MS. ZUCKER:  Objection.

19          THE WITNESS:  Prior to -- I'm going to say -- let

20      me just think about this for a quick minute.

21          There was a time when Dr. Shervin was strictly at

22      the Kennebunk location, she then moved to the Sanford

23      location -- I want to say that was a year ago August --

24      and with that Goodall tried to do everything possible,

25      if you will, to help promote having a third surgeon and

1    promoting volume.

2          At the end of the day, I don't know if we can say

3    it's just not there, I don't know if we can say -- it's

4    just a question of do we need three orthopedic surgeons

5    here at Goodall Hospital.

6    BY MR. HOLTZ:

7    Q.   Let me ask it this way.  Can I refer you to Exhibit 7

8         again.  This is the December 2011 contract.

9    A.   Sure.

10   Q.   What was the term of that?  Once the agreement was

11        signed, what's the term of that agreement?

12   A.   That one is --

13   Q.   Is it reflected at Exhibit A?

14   A.   Oh, yes, it should be at the top.

15          Yes, November 1st, 2011 to May 31st, 2012.  And

16        what we've done -- again from a standardization

17        perspective -- is try to bring all the physicians when

18        we're renewing contracts to the fiscal year, our fiscal

19        year is May 31st.

20   Q.   Okay.  Have you told me all the reasons why the hospital

21        decided to terminate Dr. Shervin's contract?

22   A.   Yes, I believe I have.

23   Q.   Okay.  I'd like to show you what's going to be marked as

24        Exhibit 9, if I could.

25

1           MS. ZUCKER:  -- actually, sir.

2           MR. HOLTZ:  I'm sorry.

3           MS. ZUCKER:  I don't respond when people say,

4       right?

5           MR. HOLTZ:  Then don't respond.  That's actually my

6       preference.

7    BY MR. HOLTZ:

8    Q.  I'd like to show you, Ms. Aprile, what's being marked as

9        Exhibit 15.

10          (Deposition Exhibit No. 15, July 29, 2010 E-Mail to

11       Nina Shervin from Carol Lantagne, was marked for

12       identification.)

13   BY MR. HOLTZ:

14   Q.  Have you had a chance to look at what's been marked as

15       Exhibit 15, Ms. Aprile?

16   A.  Yes, I have.

17   Q.  Do you recognize this document?

18   A.  Yes.

19   Q.  Can you identify it, please?

20   A.  It's an e-mail from Carol, the nursing supervisor, to

21       Dr. Shervin.

22   Q.  And what's being -- is there a report here to the

23       hospital?

24          MS. ZUCKER:  Objection.

25          THE WITNESS:  Is there a report?

```
 1              MR. HOLTZ:  I'm sorry, strike that.
 2    BY MR. HOLTZ:
 3    Q.   What was Dr. Shervin being apprised of here by the
 4         hospital?
 5    A.   That she was trying to be reached and that her phone
 6         messages were full.
 7    Q.   Anything else?
 8    A.   That Dr. Bhargava was trying to get a hold of her and
 9         concerned that if there was an emergency, that we'd be
10         un able to get a hold of her.
11    Q.   Now, had this concern arisen before at the hospital?
12              MS. ZUCKER:  Objection.
13              THE WITNESS:  I don't know the timeline of the
14         other incident or if this is one in the same.  This came
15         after.
16              I'm unsure.
17    BY MR. HOLTZ:
18    Q.   Had this occurred on more than one occasion can you now
19         say?
20    A.   Yes.
21    Q.   Were there ever allegations that Dr. Shervin had engaged
22         in work dumping during her time here at the hospital?
23              MS. ZUCKER:  Objection.
24    BY MR. HOLTZ:
25    Q.   Do you understand what I mean by the phrase work
```

1    dumping?

2 A.  Yes.

3 Q.  You do or you do not?

4 A.  Yes, I do understand that.

5 Q.  Had there been allegations against Dr. Shervin in that

6    regard?

7 A.  Not that I'm aware of.

8         (Deposition Exhibit No. 16, August 10, 2011 E-Mail

9    to Faye Coleman from Adam Shlager, was marked for

10   identification.)

11        MR. HOLTZ:  Tell me when you've had a chance to

12   look at that, okay.

13 BY MR. HOLTZ:

14 Q.  Have you had a chance to look at Exhibit 16?

15 A.  Yes, I have.

16 Q.  Can you identify this document?

17 A.  Yes.

18 Q.  Go ahead.

19 A.  It's an e-mail from Adam, the vice president of

20   physician practices, to Faye Coleman, who is the

21   director of operations for the medical group.

22 Q.  Does this e-mail from Mr. Shlager report a concern

23   having to do with Dr. Shervin's work performance?

24 A.  It does.

25 Q.  And what is the concern being reported?

```
1              MS. ZUCKER:  Objection.
2              THE WITNESS:  That when Dr. Shervin was on call
3          that patients called and either got no answer or no call
4          back.  So they called ortho on call.
5     BY MR. HOLTZ:
6     Q.   What was the hospital's concern in or around that time
7          of this event?
8              MS. ZUCKER:  Objection.
9     BY MR. HOLTZ:
10    Q.   Can you tell us?
11    A.   Yeah, that Dr. Shervin should have seen the patients as
12         opposed to Dr. Goudreau.
13    Q.   And what happened here?  Can the hospital say?
14             MS. ZUCKER:  Objection.
15    BY MR. HOLTZ:
16    Q.   Did she see the patient?
17             MS. ZUCKER:  Objection.
18    BY MR. HOLTZ:
19    Q.   To the hospital's knowledge?
20    A.   It does not appear that way but --.
21    Q.   Were there allegations -- strike that.  Let me start
22         again.
23             Do you remember we talked about the employment
24         contracts offered to Dr. Shervin and signed with her --
25    A.   Yes.
```

1    Q.   -- as part of her employment?

2    A.   Yes.

3    Q.   Were there provisions in there about the timely keeping

4         of records?

5    A.   I believe so.

6    Q.   Patient charts?

7    A.   That's -- yes, I believe so.

8    Q.   I'm not going to ask anything specific.  If you need to

9         look at it, you can.

10             Were there provisions in that -- strike that.

11             Is it the hospital's expectation that its

12        physicians will keep accurate patients' charts?

13   A.   Yes.

14   Q.   And make accurate entries into patients' charts?

15   A.   Yes.

16   Q.   Why?

17   A.   For documentation, coding, and proper billing.

18   Q.   Why else?

19   A.   Patient follow-up, patient safety.

20   Q.   Were there complaints against Dr. Shervin that she

21        failed to make accurate chart entries during her time

22        here --

23             MS. ZUCKER:  Objection.

24   BY MR. HOLTZ:

25   Q.   -- was the hospital aware?

1           MS. ZUCKER:  Objection.

2           THE WITNESS:  Yes, I believe so.

3    BY MR. HOLTZ:

4    Q.   Were there allegations that Dr. Shervin fabricated chart

5         entries with respect to her patients being seen here?

6           MS. ZUCKER:  Objection.

7           THE WITNESS:  I do not have recollection of that.

8           MR. HOLTZ:  Okay.

9    BY MR. HOLTZ:

10   Q.   Were there allegations against Dr. Shervin of other

11        impropriety -- strike that.

12          Let me go back to the first question I asked you.

13        The first question I asked you was whether there were

14        allegations that Dr. Shervin inaccurately kept patient

15        charts, and you said -- I believe that was the question

16        and if I'm wrong I'll have it read back.

17   A.   Inaccurately kept patient charts?

18          MS. ZUCKER:  Objection.

19          THE WITNESS:  Explain that to me.

20          (The requested question was read back by the

21        reporter.)

22   BY MR. HOLTZ:

23   Q.   What were they?

24          MS. ZUCKER:  Objection.

25          THE WITNESS:  I don't recall.

```
 1           could.
 2    A.     Okay.
 3    Q.     And did you take a look at it.
 4           Have you had a chance to look at Exhibit 18?
 5    A.     I have.
 6    Q.     Do you recognize this document?
 7    A.     Yes.
 8    Q.     Can you identify it for us?
 9    A.     Yes, it's an e-mail from Shannon to Dr. Shervin.
10    Q.     And does it appear to be a true and accurate copy of the
11           document?
12    A.     It does.
13    Q.     And had you seen it before today?
14    A.     Yes, I had.
15    Q.     And this is the same Shannon Davila you just earlier
16           identified as the manager of quality --
17    A.     Yes, and joint commission.
18    Q.     What's being reported here?
19    A.     That three charts were lacking the time.
20    Q.     The time of what?
21    A.     The time on the admission order, presurgical updates,
22           and -- so timing, when she actually did the postop note,
23           timing when she did the preop note.  You have to
24           actually put the time in.
25    Q.     Does it say times on the preop notes or does it say
```

1       times on the admission orders, presurgical updates, and

2       then the word "and" immediate postoperative notes?

3            Did I just read that correctly?

4   A.  You did.

5   Q.  So is this a failure to make a complete postoperative

6       note by Dr. Shervin?

7            MS. ZUCKER:  Objection.

8            MR. HOLTZ:  Yes or no.

9            MS. ZUCKER:  Objection.

10           THE WITNESS:  Yes.

11  BY MR. HOLTZ:

12  Q.  And how many charts are at issue here again, please?

13  A.  I'm sorry?

14  Q.  How many charts were at issue here?

15  A.  Three surgical charts.

16  Q.  And how many charts were at issue a month earlier on

17      Exhibit 17?  Was it two?

18  A.  Yes, it appears it was two.

19  Q.  If a physician were to release patient information

20      outside the hospital to someone not affiliated with the

21      hospital, is that a violation of the nondisclosure

22      obligation in the physician's contract?

23           MS. ZUCKER:  Objection.

24           THE WITNESS:  Yes, it is.

25

1    BY MR. HOLTZ:

2    Q.   Is it a violation of hospital policy generally?

3            MS. ZUCKER:  Objection.

4            THE WITNESS:  Yes, it is.

5    BY MR. HOLTZ:

6    Q.   Is it a serious -- strike that.

7            What's the nature of the violation?  How would you

8        describe -- strike that.

9            Did the hospital ever conclude that Dr. Shervin had

10       released confidential patient information outside the

11       hospital?

12   A.   Yes.

13   Q.   Can you tell me what conclusions the hospital arrived at

14       in this respect?

15           MS. ZUCKER:  Objection.

16           THE WITNESS:  That her husband carried some

17       documents from wherever he was to the hospital.

18   BY MR. HOLTZ:

19   Q.   What documents?

20   A.   Medical records.

21   Q.   And what else can you tell me about that?  What was the

22       hospital's concern in that incident?

23           MS. ZUCKER:  Objection.

24           THE WITNESS:  The hospital concern would be that

25       there would be a HIPAA violation.

```
1              MR. HOLTZ:  Would be or was?
2    BY MR. HOLTZ:
3    Q.   Was the hospital's concern that there would be or that
4         there in fact was?
5              MS. ZUCKER:  Objection.
6              THE WITNESS:  That there was.
7    BY MR. HOLTZ:
8    Q.   And how many patient charts were involved, do you know?
9    A.   I don't remember.
10   Q.   More than one?
11   A.   I don't remember.  I really don't.
12   Q.   Who would know?  You know this is one of the areas of
13        examination?
14   A.   Yeah, I mean, I read the document.  I can reread it.
15             The person at the time who was the health
16        information director would probably know.
17   Q.   Who's that?
18   A.   That is Paula Crosbie.  She no longer works here.
19   Q.   Again, who is Faye Coleman?
20   A.   Faye Coleman is the director of operations at the
21        medical group.
22   Q.   In Kennebunk?
23   A.   Yes.
24   Q.   I'll show you what's going to be marked as 19.
25
```

1              (Deposition Exhibit No. 19, November 10, 2011

2         E-Mail to Paula Crosbie from Faye Coleman, was marked

3         for identification.)

4    BY MR. HOLTZ:

5    Q.   Have you had a chance to look at Exhibit 19?

6    A.   I have.

7    Q.   And do you recognize this document?

8    A.   I do.

9    Q.   And can you identify this document?

10   A.   Yes.   It's an e-mail from Faye, the director of

11        operations, from the medical group, to our director of

12        health information and management, who is our privacy

13        officer -- who was our privacy officer, Paula Crosbie.

14   Q.   And I apologize for asking who Faye Coleman was because

15        it's a little embarrassing.   It happens to be right

16        there in the document.

17             So with this document, does it appear to be a true

18        and accurate copy of the document you recognize?

19   A.   It does.

20   Q.   Is this the incident we were just discussing being

21        reported here?

22   A.   Yes.

23   Q.   Did the hospital conclude that Dr. Shervin's husband was

24        in possession of two unsecured patient charts?

25             MS. ZUCKER:   Objection.

```
 1              THE WITNESS:  Based on this e-mail, yes.
 2    BY MR. HOLTZ:
 3    Q.   Did the hospital conclude that Dr. Shervin violated
 4         HIPAA in this respect?
 5              MS. ZUCKER:  Objection.
 6              THE WITNESS:  I --
 7              MR. HOLTZ:  Let's start with yes or no.
 8              MS. ZUCKER:  Objection.
 9              THE WITNESS:  Yes.
10    BY MR. HOLTZ:
11    Q.   She either did or she didn't.  What's the hospital's
12         answer, please?
13    A.   Yes.
14    Q.   Were there other instances where the hospital concluded
15         that Dr. Shervin had released confidential patient
16         information outside the confines of the hospital or to
17         authorized [sic] personnel?
18    A.   Not to the best of my knowledge.
19    Q.   Do you know who Dr. Dennis Burke is?
20    A.   Yes, I do.
21    Q.   And can you identify what -- he's had a role here at the
22         hospital?
23    A.   He has.
24    Q.   What role?
25    A.   He is on our courtesy staff, and he assists Dr. Shervin
```

CERTIFICATE

I, Lisa Fitzgerald, a Notary Public in and for the State of Maine, hereby certify that on May 14, 2012, personally appeared before me PATRICIA APRILE, the within-named deponent, who was sworn to testify to the truth, the whole truth, and nothing but the truth, in the cause of action NINA SHERVIN, MD, v. ORTHOPEDIC ASSOCIATES, HARVARD UNIVERSITY/HARVARD MEDICAL SCHOOL, THE PRE, PARTNERS HEALTHCARE SYSTEM, INC., HARRY E. RUBASH, MD., and JAMES H. HERNDON, M.D. now pending in the COMMONWEALTH OF MASSACHUSETTS, COMMISSION AGAINST DISCRIMINATION; and that this deposition was stenographically reported by me and later reduced to typewritten form with the aid of computer-aided transcription; and the foregoing is a full and true record of the testimony given by the witness.

I further certify that I am a disinterested person in the event or outcome of the above-named cause of action.

I further certify that the adverse party was duly notified according to law to attend at the taking of said deposition and did attend.

IN WITNESS WHEREOF, I subscribe my hand and affix my seal this May 25, 2012.

*Lisa Fitzgerald*

_____
LISA FITZGERALD, NOTARY PUBLIC
Court Reporter

My commission expires: May 10, 2018